**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------X

**Keith Henry,**

                         **Plaintiff,**          02-CV-1372 (CPS)

   **- against -**                               **MEMORANDUM**
                                                 **OPINION AND ORDER**

**Rehab Plus Inc., d/b/a/ Rehab**
**Plus Therapeutic Products,**

                         **Defendant.**

----------------------------------------X

SIFTON, Senior Judge.

    Plaintiff, Keith Henry, commenced this action by filing a

complaint invoking this Court's diversity jurisdiction against

defendant, Rehab Plus, Inc., d/b/a Rehab Plus Therapeutic

Products ("Rehab Plus"). The complaint sets forth claims for

relief based on negligence, strict products liability, breach of

implied warranty, breach of express warranty, and unfair and

deceptive trade practices.  Defendant Rehab Plus now moves for

summary judgment dismissing the complaint pursuant to Fed. R.

Civ. P. 56. For the reasons set forth below the defendant's

motion for summary judgment is granted in part and denied in

part.

                         BACKGROUND

    The following facts are taken from the submissions of the

parties in connection with the present motion.  They are

undisputed except where noted.

Defendant Rehab Plus was formed in 1989 by David Foster and Ronny Bilbo to manufacture and sell a variety of medical and industrial products. [Foster Dep. 10.] For example, the medical division sells ankle weights and orthopedic soft goods, such as wrist splints, elbow protectors, and ankle braces made from a soft material. [Id.] The industrial division sells safety vests and fire retardant clothing. [Id. at 18]. In 1991-1992 the industrial division of Rehab Plus began to sell back support belts. [Id.] Back support belts, "resemble corsets that encircle the abdomen and lower back" and often include attached suspenders.[Pl. Ex. 1]. They are usually "constructed of elastic materials". [Id.] Back support belt manufacturers generally claim that their belts prevent worker injury during lifting.[1] [Id.] Accordingly, they are used in numerous industries in an attempt to prevent back injuries. In his deposition, David Foster, stated that Rehab's design for the back supports was adopted from that of a Rehab Plus competitor, Ergodyne. [Id. at 24-25]. In contrast, the plaintiff asserts that the design was taken from a different competitor, FLA Orthopedics ("FLA"). [Pl. R. 56.1. ¶19].[2] In support of this position, plaintiff points to the fact

---

[1] However, Foster testified that Rehab Plus back supports are only meant to remind workers to use proper lifting techniques not to otherwise prevent back injuries.

[2] The FLA support belt included fitting instructions and proper lifting technique instructions. It also included the following warning: "Caution: this product will not prevent back injury nor increase the wearer's ability to lift heavier loads. Failure to follow proper wearing and lifting instruction could

that Rehab's alleged use of the FLA design was the subject of a patent infringement suit filed by FLA in 1999 in the Southern District of Florida under case number 1:99cv690. The suit was eventually settled.

In 1994, two government regulatory agencies, the National Institute for Occupational Safety and Health ("NIOSH") and Occupational Safety and Health Administration ("OSHA") released studies questioning the usefulness of back support belts. In a NIOSH paper entitled, "Back belts, Do They Prevent Injury?", the Institute found that the utility of back support belts was inconclusive but that workers who falsely believed that they could lift more while wearing a back belt might subject themselves to greater risk by lifting more weight than they would have without the belt. [Pl. Ex. 1].

In 1994, Rehab negotiated with Sears, Roebuck and Company ("Sears") to provide back supports to Sears employees. Prior to 1994 Sears provided its employees with FLA brand back supports. According to Sears Manager of Safety and Health, Timothy Stuart, Sears switched to providing its employees with Rehab back supports because the Rehab back supports were made from higher quality materials. [Stuart Dep. 12]. Sears requested that the manufactured back supports have attached shoulder straps, and not detachable straps. Sears also required cross-stitching on some of

_____

lead to personal injury."

the closures so that they would not warp, twist or bend.

According to David Foster, Rehab Plus believed the back supports were useful because they serve as a "constant reminder to use proper lifting techniques." [Foster Dep. 36]. Foster states that Rehab never portrayed its support belts as useful for any other purpose. [Id.]

In 1994, Rehab manufactured the requested back supports in two styles. One "all-purpose" (sic) style and one style specifically made for women. [Stuart Dep. 41-42]. There have been no design changes or alterations to the back support belt since the inception of production. [Foster Dep. 98; Stuart Dep. 15]. Individual Sears stores ordered back supports from Rehab on an as-needed basis. The support belts were then delivered from Rehab directly to individual Sears stores. [Henry Dep. 51-52; Stuart Dep. 18; Foster Dep. 64-65]. Each back support was packaged in an individual clear plastic "ziploc" bag. [Id.] In his deposition, Stuart, the Sears Manager for Safety, testified that each support belt came with a pamphlet outlining its care and maintenance [Stuart Dep. 19]. However, plaintiff's deposition testimony was that no care or maintenance instructions accompanied the support belts. [Henry Dep. 51-52]. Both sides agree that Rehab Plus did not produce any safety or use instructions for the support belt.

In 1997, plaintiff, Keith Henry began working at the King's Plaza Sears located on Flatbush Avenue at Kings Plaza, Brooklyn,

New York. [Henry Dep. 12-13]. Henry was initially hired as a stock clerk, a job that involved lifting boxes. [Henry Dep. 40]. Although Henry received training related to loss prevention and other Sears policies [Henry Dep. 42-43], he did not receive any training in lifting or back injury prevention. [Henry Dep. 48-49; 51-52]. When Henry was hired, Sears did not require its employees to wear support belts nor did it provide such belts. However, Henry wore a weight belt, designed primarily for weight lifters, which he had purchased himself at Modell's. [Henry Dep. 39].

In 1998, Sears began a back injury prevention training program. [Henry Dep. 8]. As Manager of Safety and Health, Stuart was responsible for overseeing its creation. [Stuart Dep. 43]. The new program consisted of a video, a facilitator's handbook, a participant's handbook, and posters describing proper lifting technique. [Stuart Dep. 9]. The facilitator's guide provided a step by step process for back injury prevention training. [Stuart Dep. 27-28]. A third party vendor, Liberty Mutual, used the guide to run training sessions at individual retail locations for Sears employees. [Stuart Dep. 45-46; 53-54]. At these sessions employees watched the video, entitled, "back injury prevention training" which stated that back support belts protect from back injuries. [Stuart Dep. 17]. Although Sears developed the basic concepts and contents of the program, Rehab Plus assisted in the process. [Stuart Dep. 10]. During training sessions employees

were provided with the participant's handbook. The participant's handbook provided tips on how to prevent back injury and described the proper way to don, wear and maintain a back support belt. [Stuart Dep. 27]. Sears issued certificates of completion to employees who finished the program. [Stuart Dep. 40].

Plaintiff states, however, that this new training program was not available at the Kings Plaza Sears, and that accordingly he never received training. [Henry Dep. 48-49; 51-52].

In 1998, Sears conducted a meeting to instruct its employees that they must wear back support belts emblazoned with "Sears." [Henry Dep. 46-47]. Henry believed that this was because the support belts would protect his back during lifting. [Henry Dep. 46]. At that meeting Henry received a Rehab Plus support belt. [Henry Dep. 37-38; 47]. The belt was black and said "Sears" on the back. It had a velcro fastener in the front and shoulder straps. Henry did not have to complete any paperwork in connection with his receipt of the back support belt from Sears. [Henry Dep. 37]. No one from Sears gave Henry any instruction regarding the proper use of the support belt. He was not instructed in how to fasten the velcro, [Henry Dep. 63], on where to position the belt on his torso [Henry Dep 64], on how to use the shoulder straps, or on how to position the shoulder straps. [Henry Dep. 67]. Henry believed he knew what to do with the back support belt. He knew to pull the velcro fastener so that the

belt fit snugly and to adjust the shoulder straps so that they were not too long and fit against his shoulders. [Henry Dep. 67].

Henry was permitted to take the belt home and bring it back to work, and in fact, generally wore it to and from work [Henry Dep. 35]. In 1999, Henry left his belt at home and received a new one. [Henry Dep. 54-56; 60]. When he received the new belt, Henry was required to sign a receipt. That receipt stated,

> I Keith Henry, Associate #5207, have been given a new back belt. These belts are an important safety item and will prevent injury when used along with proper lifting techniques. It is my responsibility to wear it everyday when I am involved in lifting merchandise. I'm also responsible for ensuring the belt is in my possession at all times. . . . if I'm found lifting merchandise without wearing my belt I will be written up. I realize my second write-up for this offense will be a final warning, and the third will result in my immediate termination.

Def. Ex. H.

On July 28, 1999, Henry was working as a supervisor of the bed and bath department at the Kings Plaza Sears [Henry Dep. 12], unloading a truck and wearing the support belt he had received earlier that year. [Henry Dep. 88-89]. The belt was fastened securely. When he bent over to lift a box of plates he felt a sharp pain in his lower back. [Henry Dep. 86-87, 96]. The sharp pain subsided quickly, and although his back still hurt, Henry continued to work for 20-25 minutes, [Henry Dep 101-1-2; 104-105], carrying lighter items, such as comforters. However, when Henry stepped on his left leg he felt crepitation in his back.

[Henry Dep. 106]. Henry then ceased work, reported his injury and was taken to the hospital. He has been unable to work since.

DISCUSSION

Jurisdiction

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff and defendant are each citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©)

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). Although all facts and inferences are to be viewed in the light most favorable to the party opposing the motion, *see*

*Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir.

2001), the nonmoving party must raise more than just

"metaphysical doubt as to the material facts," *Matsushita*, 475

U.S. at 586.

<u>Negligence</u>

In order to prevail on claim of negligence as against a

manufacturer, under New York Law, a plaintiff must show, (1) that

the manufacturer owed the plaintiff a duty to exercise reasonable

care, (2) a breach of that duty, (3) damages caused by the

breach. *Clarke v. LR Systems*, 219 F.Supp. 2d 323, 330 (E.D.N.Y.

2002); *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997).

A "manufacturer's duty extends to warning consumers of

latent dangers resulting from the foreseeable use of its product

of which the manufacturer knew or should have known." *Bukowski v.

CooperVision Inc.,* 592 N.Y.S.2d 807 (N.Y. App. Div., 3d Dep't,

1993); *McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 68

(N.Y. 1962); *Rastelli v. Goodyear Tire & Rubber Co.,* 79 N.Y.2d

289, 297 (N.Y. 1992). It is undisputed that Rehab Plus included

no warnings with its support belt. In 1994 studies by NIOSH and

OSHA found that the use of back support belt may lead workers to

"falsely believe they are protected" which may cause them "to

subject themselves to even greater risk by lifting more weight

than they would have without a belt. Henry received his first

Rehab Plus support belt in 1998, and received the belt he was

wearing while injured in 1999. Thus, Rehab Plus had five years

after the release of the study to learn of its conclusions, and

unless the study was shown to be inaccurate,[3] incorporate them

into appropriate warnings. FLA, the manufacturer of a support

belt on which plaintiff contends the Rehab Plus belt is based,

included both a warning stating that "this product will not

prevent back injury nor increase the wearer's ability to lift

heavier loads," [Pl. Ex. 2] and came accompanied by instructions

for proper lifting techniques. Thus, construing the facts in a

light most favorable to Henry, a jury could find that there was a

foreseeable risk of latent danger in its belt concerning which

Rehab Plus had a duty to warn foreseeable users such as Henry and

that Rehab Plus failed to do so because it failed to include a

warning stating that the belt was useful only as a reminder.

Henry must also show that the failure to warn was the

proximate cause of his injury. In New York there is a presumption

that a user would have heeded warnings if they had been provided

and that the injury would not have occurred. *Anderson v. Liberty

Lobby, Inc.,* 477 U.S. 242, (1986). A jury could thus conclude

based on Henry's testimony that he believed the support belt

would prevent injury and based on plaintiff's expert witness

report to the same effect, that Rehab Plus's failure to warn was

---

[3] Defendant has not offered any evidence that more recent studies have made such a showing.

the proximate cause of Henry's injury.

A defense to liability for failure to warn exists when the injured party had actual knowledge of the danger. *Howard Stores Corp. v. Pope,* 1 N.Y.2d 110, 115 (N.Y. 1956); *Rosebrock v. General Elec. Co.,* 236 N.Y. 227, 240, 241 (N.Y. 1923). While it is undisputed that Sears did offer training in proper lifting techniques and the usefulness of a back support belt, Henry testified that he did not receive any such training. Therefore, again construing the facts in a fashion most favorable to Henry, it must be assumed that he did not have actual knowledge of the danger, and accordingly, at least on summary judgment, Rehab Plus cannot escape liability on this ground.

## Strict Products Liability

The plaintiff has also stated a claim for strict products liability. In order to prevail on such a claim he must "(1) a defective product, (2) caused his injury." *Colon Ex. Rel. Melina v. BIC USA, Inc.,* 199 F.Supp.2d 53, 84 (S.D.N.Y. 2001). Under New York law a product may be defective because of a failure to warn. *McCarthy*, 119 F. 3d 198; *Sage v. Fairchild-Swearingen Corp.,* 70 N.Y.2d 579 (N.Y. 1987); *Torrogrossa v. Towmotor Co.,* 44 N.Y2.d 709 (N.Y. 1978). "The elements of a failure to warn claim are: (i) that a manufacturer had a duty to warn; (ii) against foreseeable uses about which it knew or should have known; and (iii) that failure to do so was the proximate cause of the harm.

*Derienzo v. Trek Bicycle Corp.,* 376 F.Supp. 2d 537, 566 (S.D.N.Y. 2005). Although strict liability is often described as containing a risk/utility balancing test, this "'risk/utility' inquiry is the same as the inquiry in a traditional negligence action where "the reasonableness of an actor's conduct is considered in light of a number of situational and policy-driven factors." *Gonzalez by Gonzalez v. Morflo Industries, Inc.,* 931 F.Supp. 159, 164 (E.D.N.Y. 1996)(quoting *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258 (N.Y. 1995)). Thus, in the failure to warn context the strict liability inquiry is substantially the same as the negligence inquiry. *Colon,* 199 F.Supp.2d at 84. Accordingly, for the reasons set forth above in the context of a negligence claim against a manufacturer, summary judgment is not appropriate here.

Breach of Implied Warranty

Under a theory of breach of implied warranty of merchantability or breach of implied warranty of fitness for a particular purpose, the inquiry is focused on consumer expectations when the product "was being used for the purpose and in the manner intended." *Beneway v. Superwinch, Inc.,* 216 F.Supp. 2d 24, 30 (N.D.N.Y. 2002); *Derienzo*, 376 F.Supp.2d at 570. The product must be "fit for the ordinary purposes for which such goods are used." *Denny*, 87 N.Y.2d 248.

Defendant argues that where, as here, a jurisdiction recognizes a tort action in strict products liability, a claim

for implied breach of warranty is superfluous and should be dismissed. *Heller v. U.S. Suzuki Motor Corp*., 64 N.Y.2d 407, 411 (N.Y. 1985). The two causes of action were not always the same. Strict liability sounds in tort and does not require privity whereas implied breach sounds in contract and thus originally required privity between the parties. *Heller*, 64 N.Y.2d at 436. However, in New York, privity is no longer required for recovery under a theory of breach of implied warranty. Thus, defendant argues that the two causes of action have become identical. *Donald Shinn Fu Co. of America*, 2002 WL 32068351, *4 (E.D.N.Y. 2002)("[s]trict Liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action")(citations omitted).

"However, it is not true as a matter of law that all breach of implied warranty claims are mere doppelgängers of their more modern strict products liability cousins." *Denny*, 87 N.Y.2d at 256. An implied warranty claim asks only whether the product was fit for its intended purpose, while the strict liability claim requires a risk-utility balancing test which takes into account the utility of the product, the feasibility of an alternative design and the risk of injury. *Donald*, 2002 WL 32068351 at 4. A finding that a products liability claim and a breach of implied warranty claim are distinct "requires a showing that the 'ordinary purpose' for which the product was sold and marketed is

not the same as the purpose that provides the utility that
outweighs the risk of injury." *Gonzalez,* 931 F.Supp. at 167. Thus
for example, in a tort suit concerning a Ford Bronco, the court
concluded that a jury could rationally find that the Ford's use
as an off-road vehicle outweighed the risk of injury from
"rollovers," but that the vehicle was not safe for its 'ordinary
purpose' of road driving. *Denny,* 87 N.Y.2d 248. Similarly, in
*Donald*, a case concerning the safety of a jack used to raise
forklifts so that repairs could be completed on their undersides,
the court concluded that a reasonable jury could find that the
"jack's "ordinary purpose" as marketed is to hold in place fork
lifts while repairs are made, while defendants could show that
the utility of having a product that elevates (but doesn't hold
in place) a fork lift outweighs the risk that it could collapse
while being jacked up." 2002 WL 32068351 at *5.

Where, as here, defendants merely assert that "the two
claims are redundant" without offering any "more detailed
argument," defendants have not demonstrated that the plaintiff
could not make a showing that the ordinary purpose was unsafe,
even though the utility of the non-ordinary purpose outweighed
the risk. *Id.* at *4. Thus in this case, plaintiff might show
that the belt's "ordinary purpose" is to prevent back injuries,
which it is not fit to do, but defendant's might show that the
utility of reminding individuals to lift carefully outweighed the

risk that they might be lulled into a false sense of security
causing them to lift dangerously heavy objects. Accordingly, the
breach of implied warranty claim is not identical to the strict
liability claim. It is therefore not superfluous and is not
dismissed.

Breach of Express Warranty

To recover under a theory of breach of express warranty the
plaintiff must prove first, that the express warranty was
included in the contract, *Donald*, 2002 WL 32068351, *5, and
second, "that the product was being used for the purpose and in
the manner intended." *Beneway,* 216 F.Supp. 2d; *Codling v. Paglia*,
32 N.Y.2d 330, 342 (N.Y. 1973).

Here, issues of reliance, purpose and intended manner need
not be reached as the record does not reveal the existence of any
express warranties.[4] Henry raises a claim of express breach of
warranty in his complaint [Complaint ¶23] but his opposition to
defendant's motion for summary judgment makes no mention of a
breach of an express warranty claim, and states only that,
"[p]laintiff has sufficiently alleged claims in implied

---

[4] At oral argument plaintiff argued for the first time that the name of
the product, "back support belt" constituted an express warranty. An express
warranty is created by "[a]ny affirmation of fact or promise made by the
seller to the buyer which relates to the goods and becomes part of the basis
of the bargain." N.Y.U.C.C. §2-313(2). However, the plaintiff has not offered
any evidence that Rehab Plus's product was a "back support belt." The only
evidence presented on the subject describes the label on the belt used by
plaintiff as bearing the word "Sears," a tag with washing instructions, a
serial number and a statement that the belt was made by Rehab Plus. [Foster
Dep. 67-74].

warranties . . . and has produced concrete admissible evidence to support these claims." Pl. Reply Br. 6. Since there is no evidence of an express warranty, defendant's motion for summary judgment on this claim is granted. *Donald,* 2002 WL 32068351, *5 (granting summary judgment for the defendant on a breach of express warranty claim where "a review of the record reveals no express warranties at all. Only in plaintiffs' complaint-and never in their response to defendants' motion-do plaintiffs even mention express warranties. Indeed, plaintiffs conclude their response to defendants' motion for summary judgment by claiming that they have 'set out a prima facie case of products liability based on defective design, inadequate warnings, manufacturing design and breach of implied warranty of merchantability.' Absent is any mention of breach of express warranty.")

Unfair and Deceptive Trade Practices

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business." NYGBL § 349. "To prevail under § 349 of the NYGBL, a plaintiff must show that '(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result.' *U-Neek, Inc. v. Wal-Mart Stores, Inc.,* 147 F.Supp. 2d 158, 175 -176 (S.D.N.Y. 2001) (quoting *Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir. 2000)). The standard for whether a practice is misleading is

objective, requiring a showing that the "reasonable consumer would have been misled by the defendant's conduct." *Champion Home Builders Co. v. ADT Sec. Services, Inc.*, 179 F.Supp. 2d 16, *27 (N.D.N.Y. 2001) (quoting *Berrios v. Sprint Corp,* 1998 WL 199842 at *3 (E.D.N.Y. 1998)).

Section 349 has been applied in a variety of different contexts. The types of trade practices which courts have found to be deceptive include: (1) false advertising; (2) pyramid schemes; (3) deceptive preticketing; (4) misrepresentation of the origin, nature or quality of the product; (5) false testimonials; (6) deceptive collection efforts against debtors; (7) deceptive practices of insurance companies; and (8) "bait and switch" sales tactics. *See Teller v. Bill Hayes, Ltd.,* 630 N.Y.S.2d 769, 773 (N.Y. App. Div., 2d Dep't, 1995) (collecting cases).

Plaintiff alleges that defendant falsely advertised the product and misrepresented its nature. However, plaintiff has submitted no advertisements, statements, or other misrepresentations by Rehab Plus. Indeed, plaintiff specifically testified that he received no instructions, warnings or information of any kind from Rehab Plus. [Henry Dep. 51-52]. Presumably plaintiff relies not on an express misrepresentation but on a misrepresentation by an omission or failure to disclose the substance of the NIOSH findings. An omission can give rise to a claim under §349. *Solomon v. Bell Atlantic Corp.,* 9 A.D. 3d 49

(1st Dept. 2004). However, an omission becomes a
misrepresentation only in a situation in which it renders other
statements made by a defendant misleading. See e.g. *Fogarazzo v.
Lehman Bros.*, 341 F.Supp. 2d 274 (S.D.N.Y. 2004). Here, plaintiff
relies on the name of the belt as the affirmative statement
rendered misleading by reason of the omission. However, as
already noted, there is no evidence of any label on the belts
delivered to Sears or to plaintiff describing the belts in a way
that required that the omitted warning be made in order to insure
that the label was not misleading.

Since plaintiff cannot show that Rehab Plus misled
consumers, either himself or Sears, though deceptive acts,
summary judgment is appropriate for the defendant on this claim.

CONCLUSION

For the foregoing reasons defendant's motion for summary
judgment is granted in part and denied in part.

The Clerk is directed to furnish a filed copy of the within
to all parties and to the magistrate judge.

SO ORDERED.

Dated :   Brooklyn, New York

December 12, 2005

By: /s/ Charles P. Sifton (electronically signed)
United States District Judge